THE PEOPLE, *ex rel.* Dan Marvin and others, *vs.* THE CITY
  OF BROOKLYN AND THE MAYOR OF SAID CITY.

Under the section of the charter of the city of Brooklyn which provides that the
  expenses in the construction of sewers shall be assessed and be a lien upon the
  property to be benefited thereby, in proportion to the amount of the benefit,
  the jurisdiction conferred is limited to the property to be benefited. When it
  becomes a question of fact whether a proposed improvement will be advan-
  tageous to the property in any designated direction, the decision of the corpo-
  rate authorities is conclusive.

But there must be a question—something to decide—where the district is not
  clearly included. If it is entirely clear that any portion of a proposed district
  cannot be benefited, an attempt to render the property in it liable to pay a
  part of the expenses, may be defeated, if not before the corporate authorities,
  certainly before a judicial tribunal having the power to annul or correct the
  proceeding.

Where a portion of the property assessed for the construction of a sewer is so
  situated that it will not be benefited by the sewer, and there is no connection
  by sewer between such property and the projected sewer, and there cannot be
  any, by reason of the existence of a rail road tunnel in one of the intervening
  streets, such property is beyond the limits of rightful assessment, and its own-
  ers cannot be called upon to contribute towards the improvement.

THIS was a common law certiorari, to review the proceedings
  and assessments for a sewer in Warren street, Brooklyn,
from Court street to the East river. It appears from the re-
turn to the certiorari that commissioners were appointed to
apportion and assess the expense of constructing the sewer, and
that they proceeded to make an assessment and give the notices
required by law to parties interested. That various objections
were made to the report and assessments, by the relators and
other parties. That notwithstanding the objections, the com-
missioners completed and signed their report, and presented it
to the common council for confirmation, who referred it, pursuant
to law, to the assessment committeee, composed of five aldermen.
That the said assessment committee considered the objections,
and heard the testimony offered by the objectors. *William
Beard,* a witness on the part of the objectors, testified as fol-
lows : " I was one of the contractors that built the tunnel for
the rail road through Atlantic street ; as that tunnel is now
constructed a sewer cannot be built along Court street, from

The People *v.* City of Brooklyn.

Joralemon street, so as to connect with the Warren street sewer; there is not more than 2 or 3 feet in depth between the top of the tunnel, at the corner of Atlantic and Court streets and the pavement of the street; before I commenced excavating for that tunnel, the water along the west side of Court street flowed from Joralemon street south, to the north side of Atlantic street, and then along the north side of Atlantic street to its intersection with Smith street, according to the best of my recollection; I carried the water across Atlantic street so that it should not interfere with the construction of the tunnel; I did not get permission of the common council to change the grade in that way; I did not ask any; when I finished the work I did not restore the grade, because the street was already paved, and I did know who would pay me; if the grade had not been changed by me the water would have flowed along Atlantic street easterly to Smith street; I changed the grade as a temporary matter for my own accommodation, to prevent the water from interfering with my works east of Court street, and washing it away; I left the gutter as I made it when my work was done; I was the original contractor who graded and paved Atlantic street when it was first graded and paved, and knew how the water ran; I finished Atlantic street before Court street was graded and paved; I finished the whole works by July, 1836; I coped Court street in April, 1836." The committee made two reports; a majority report, and a minority report. The latter was as follows: "The minority of the assessment committee to whom was referred the annexed report of commissioners appointed to apportion and assess the expenses of Warren street sewer from Court street to the East river, report: that they have examined the same, and believe all the proceedings to have been regular; and, as objections have been made by parties interested therein, the committee caused due notice to be published in the corporation newspapers for five days successively, to the parties interested, of the time and place when and where they would meet to hear them on the objections and report. The objecting parties whose objections in writing are hereto annexed, appeared before the committee, and

also other parties who made verbal objections to the report. Other parties interested appeared in favor of the confirmation of the report. The testimony before the committee was taken under oath, which is hereto annexed, and one or more of the committee explained, when necessary, their report.

The first point of objection proved before the committee was on behalf of the objecting parties, whose property assessed lies north of the center line of Atlantic street. It appears by testimony offered before the committee, and by an examination of the profile maps of Atlantic street and Court street, that previous to the construction of the rail road tunnel in Atlantic street, the surface water on both sides of Court street north of Atlantic street flowed along the gutter from Joralemon street southward; and that on the westerly side of Court street, when it reached the north line of Atlantic street, crossed over the gutter on that side and flowed easterly to Smith street. Had this grade, thus established by the city, continued unchanged, no part of the surface water from north of Atlantic street would have flowed into Warren street sewer, and consequently, on the principle of assessment established by the commissioners, the property of the objectors would not have been liable to assessment. But it also appeared in evidence, that during the construction of the tunnel, the contractor of the rail road altered the gutter on the west side of Court street, so that the water should flow across Atlantic street southward along the gutter to Warren street. This was done so that the water should not interfere with the tunnel while in process of construction. No other permission of the common council for thus directing the water was granted than is embraced in the general consent for the construction of the tunnel. No consent of the common council was asked before the diversion, as it was intended to be temporary until the work was completed. The contractor states that when he finished the work he did not restore the grade, because the street was already paved, and he did not know who would pay him. The resolution of the common council granting the Long Island Rail Road Company permission to excavate and construct a tunnel, was passed March

29, 1844, and provided that the work should be subject to the supervision of this Board, and that at the completion of the tunnel, all cross-streets should be left free and clear, and all pavements removed or streets and their appendages injured in the construction of said tunnel, should be restored and placed in as good condition as they were before the commencement of the work; and to be subject to such ordinances as may be adopted by this board in relation to the same. As the gutters are appendages to streets, it will thus be seen that their restoration was fully provided for. On the 6th of March, 1845, this common council passed an ordinance, which is found on page 117 of the printed ordinances, providing that the rail road company should complete the tunnel, and replace, repair and re-set, in a good and workmanlike manner, and upon a proper grade or line, the curb and gutter stones, pavements, flagging and other materials removed or injured by said company or their contractors, agents or servants, by occasion or in construction of said tunnel, on or before the 15th day of April then next, under a penalty of one hundred dollars for each day's neglect. It will thus be seen that the continuance of the gutter across Atlantic street is contrary to the city ordinance, and it is in the power of the common council at any time, on its own motion, or on petition of the inhabitants living south of Atlantic street, to restore the gutter as it formerly was, across Court street. Such being the case, the commissioners have erred in applying their principle of assessment to the district lying north of Atlantic street. Before the payment of the assessment, the gutter in question may be restored, and then a district would be assessed which in no way would use the sewer. This is not a mere matter of discretion, which the common council may adopt or not. It is a matter of imperative law, which we are bound to observe.

The supreme court, in the case of *Le Roy* v. *Mayor &c. of New York*, (20 *John.* 430,) in reference to the principle of assessments of this kind, decided as follows: " Who are to be comprehended in assessments depends upon the principle on which it is made; that must be determined by a sound con-

struction of the law applied to the facts. It does not rest in the discretion of those who are to execute the law. The super-intending power of this court is competent to establish the principle and compel the inferior authority to be governed by it, leaving to its discretion the manner of levying and the amount of contribution to be exacted from each individual." The same court, in the case of *The People, ex rel. Post*, v. *City of Brook-lyn*, in the matter of the sewer in DeKalb avenue and Raymond street, (6 *Barb.* 209,) set aside the orignal assessment. One of the grounds of objection was, that the common council them-selves had diverted the water from its natural flow, along Myrtle and Park avenues, to the Wallabout bay, so as to take it to the Raymond street sewer.

We have, therefore, arrived at the conclusion, that the prop-erty north of the center of Atlantic street is not legally within the district of assessment, upon any principle that has hereto-fore been established, and that to confirm the report in its pres-ent shape will lead to litigation before the legal tribunals, which, in all probabilty, will result in setting the assessment aside, and lead to delay in the collection of moneys due to the contractors. While the power of the common council is ample enough to correct the report and assessment, yet, as we dis-approve of the principle upon which the commissioners acted in the assessment, we recommend the recommitment of the report to them. We think the time has come when the principle of assessment upon a large district, on account of its surface draw-ings, for a sewer which is of local benefit only, should be changed. In this case, from 66 to 70 per cent of the expense only is as-sessed upon the property really benefited by the improvement, while the remaining expense is assessed upon property which can in no way be benefited, and which will ultimately be obliged to bear all the expense of any future sewer, which the adoption of any plan for the ample supply of this city with water will render necessary, in every street occupied by buildings. We therefore recommend the adoption of the following resolution : Resolved, that the report and assessment in the matter of the Warren street sewer be sent back to the commissioners, with instructions to

The People *v.* City of Brooklyn.

· correct the same by leaving out of the district of assessments all the property lying north of the center line of Atlantic street, and to make such other corrections as they may deem just and proper."

The resolutions reported by a majority of the committee were passed by the common council, and the assessment was confirmed.

The relators were owners of lots and property included in the assessment district situate to the north of the center of Atlantic street, and between Court and Clinton streets, upon which part of the district the sum of $2196.68 has been assessed, and they objected to the assessment for the reasons stated below.

*Marvin & Prime,* for the relators. I. By the charter of the City of Brooklyn, and the statutes in force when this assessment was made, power is given to the common council to cause sewers to be constructed, and the expenses to be assessed and be a lien on the property benefited thereby, in proportion to the amount of the said benefit. (*Brooklyn City Charter of* 1850, *tit.* 4, §§ 1 *and* 24.) The jurisdiction, then, of the commissioners to include any parcel or tract within the assessment district, and to assess it, would depend on whether that tract or parcel was to be benefited by the proposed improvement.

II. This question as to whether any particular lot is to be benefited by the sewer, is a jurisdictional question; and where it does not appear by the return that any particular lot is to be benefited by the sewer, and much more, where it appears that any lot is not to be benefited, there would be no jurisdiction to lay an assessment upon such lot, and the assessment, if laid, would be illegal and void.

III. The court will examine the evidence returned, so far as relates to jurisdictional facts, in order to determine whether the court below ever acquired jurisdiction to render the judgment complained of; and where it appears that either the whole proceeding in the inferior tribunal is void for want of jurisdiction, or where the facts and evidence are wanting to sustain any part of the proceedings or judgment, the court will adjudge such part

to be void in law.  Thus in the present case, if lots have been assessed for this improvement which are not benefited 'by it, such assessments are void; and the court will examine the evidence to see whether it appears that any assessments have been made upon lots not benefited.

IV. The question what lots are to be assessed for the sewer, is not one of discretion, or of judgment or opinion, in the commissioners, but depends upon a sound construction of the law as applied to the facts.  The only discretion given to the commissioners is, to fix the amounts of the assessments upon the particular lots, after the limits of the assessment district are determined.  (See *Brooklyn Charter of* 1850, *as above cited. LeRoy* v. *The Mayor &c.* 20 *John.* 430.  *Bouton* v. *President &c. of Brooklyn*, 2 *Wend.* 395.  *Baldwin* v. *Calkins*, 10 *id.* 167.  *Soady* v. *Wilson*, 4 *Nev. & Man.* 777.  *S. C.* 3 *Ad. & Ellis*, 248.  *Rex* v. *Tower Hamlets Comm'rs of Sewers*, 4 *M. & R.* 365.  *S. C.* 9 *B. & C.* 547.  *Stafford* v. *Hamson*, 5 *Moore*, 608.  *S. C.* 2 *B. & B.* 691.  *Tracy* v. *Taylor*, 3 *Gale & D.* 14.  *S. C.* 14 *Jurist*, 170.  *St. Catherine's Dock Co.* v. *Higgs*, 9 *id.* 1030.  *Same case in error*, 11 *id.* 991.  *The People* v. *Overseers of Poor of Ontario*, 15 *Barb. Rep.* 286.  *People* v. *Goodwin*, 1 *Selden*, 568.)

V. None of the property situate to the north of Atlantic street is or can be benefited by the proposed sewer, and the commissioners had no right to include it within the assessment district.  It is situate half a mile from the proposed sewer, and the intervention of the rail road tunnel through Atlantic street, entirely prevents any sewer being made through Court or Clinton streets which shall connect with the Warren street sewer.

VI. Nor can it be said that the sewer in Warren street can be any benefit to this district north of Atlantic street for the purpose of carrying away the surface water, for it appears from Mr. Baird's evidence, and by an examination of the profile maps of Atlantic and Court streets, that previous to the construction of the rail road tunnel in Atlantic street, the surface water on both sides of Court and Clinton streets north of Atlantic street, flowed south to the north side of Atlantic street, and then in an

The People *v.* City of Brooklyn.

easterly direction to Smith street, so that no part of it could have reached the proposed sewer; that the diversion of the water by Mr. Baird across Atlantic street, while he was building the rail road tunnel, was merely temporary, during the construction of that work, and without permission or authority of the common council; that it was the duty of the rail road company to have restored the streets to their former condition, and that the continuance of the gutter across Atlantic street is contrary to the city ordinances, and that the common council or the inhabitants south of Atlantic street can at any time restore the gutter across Court street. (*City Ordin. of Brooklyn*, 1850, *p.* 117.) It may happen that before the payment of the assessment, the gutter in question may be restored, and then a district would be assessed which in no way would use the sewer.

VII. The proceedings and assessment should be quashed, at least so far as relates to the district north of the center of Atlantic street.

*N. F. Waring*, for the defendants. I. The defendants had, by the terms and conditions of their charter, jurisdiction. (*See title 4 of Charter, sec.* 1. *Laws of* 1854, *p.* 860.)

II. The record shows that the proceedings were regular and in conformity to the charter.

III. The only question to be discussed on a common law certiorari is the question of jurisdiction.

IV. The certificates of the street commissioner and attorney are conclusive evidence as to the regularity of the proceedings. (*See tit.* 5, *sec.* 10 *of the Charter. Laws of* 1854, *p.* 874.)

V. The respondents are entitled to judgment against the relators.

*By the Court*, S. B. STRONG, J. This being a common law certiorari, we can review only the questions of jurisdiction, and whether the proceedings have been conformable to the statute.

It is objected that the assessment upon the property of the relators, and of others, lying northeasterly of Atlantic street, was extra territorial, and so far transcended the jurisdiction con-

ferred by the statute upon the corporation, in such cases. The statute provides "that the expenses in the construction of sewers shall be assessed and be a lien upon the property to be benefited thereby, in proportion to the amount of the benefit." The jurisdiction conferred is limited to the property to be benefited. When it becomes a question of fact whether the proposed improvement will be advantageous to the property in any designated direction, the decision of the corporate authorities is conclusive. But then there must be a question—something to decide. I mean of course where the district is not clearly included. If it is entirely clear that any portion of a proposed district cannot be benefited, then an attempt to render the property in it liable to pay a part of the expenses should and would fail; if not before the corporate authorities, certainly before a judicial tribunal having the power to annul or correct the proceeding. Otherwise the statutory authority might be exercised in such a manner as to effectuate great and irrelievable oppression. The principle is well stated in the case cited by the minority of the committee of the common council. (*Le Roy* v. *The Mayor &c. of New York*, 20 *John.* 430.) The court there says, "who are to be comprehended in an assessment depends upon the principle on which it is made: that must be determined by a sound construction of the law applied to the facts. It does not rest in the discretion of those who are to execute the law. The superintending power of this court is competent to establish the principle and compel the inferior authority to be governed by it, leaving to its discretion the manner of levying and the amount of contribution to be exacted from each individual."

The facts in this case, or such of them as are necessary for its decision, do not seem to be disputed. There is not any connection by sewer between the lots on the northeasterly side of Atlantic street and the projected sewer through Warren street. There cannot hereafter be any, so long as the tunnel constructed by the Long Island Rail Road Company shall remain. That appears to be a permanent structure, and there is no probability of its discontinuance. Previous to the construction of the tunnel, the waters from the lots in question passed off on the same

side of Atlantic street. They did not flow through Warren street at all. It is clear that if there had been no change in this particular the relators' property could not have been benefited by the proposed sewer. It could not have carried off any of their redundant or deleterious fluids, or any that would have been injurious to them, except possibly by a general contamination of the air of the city, which would have been too remote to be taken into consideration.

When, however, the tunnel was constructed, the contractors, in order to build it with the greater facility, carried the waters which would have flowed on the northeasterly side of Atlantic street, by a change of the grade, across the street, so that they have since passed off through Warren street. One of those contractors testified that they changed the grade as a temporary measure for their own accommodation, and that he had left the gutter still leading the water across the street because he did not know who was to pay him for the requisite work if he should restore that part of the street to its pristine condition. It would seem, however, that such restoration would be facile, and that the continuation of the gutter is unnecessary. Under such circumstances it is the right of the relators and their associates to have the waters flow from their property in their former and natural channel, and it would seem to be doing them a double wrong, first to divert the waters (certainly unnecessarily after a short interval) and then to impose a burthen upon them which, but for such diversion, would have been wholly unnecessary. Besides, the improvement in Warren street and its vicinity cannot be fully carried out, as to the relators, as they can have no connecting sewer; and if they should hereafter require a sewer for the benefit of their property they could not call for a contribution from the property holders on the other side of the street. That, of itself, probably might not be a reason for wholly exonerating them from a contribution if their existing connection resulted from the original territorial structure. But as it did not, and as, in the event of a restoration, which is probable, and which they have a right to require, they would derive no possible benefit from the projected work, they ought not to be called

upon for a contribution towards its construction. Their property is beyond the limits of rightful assessment.

The proceedings of the corporation, so far as they relate to the objectionable portion of the district, should be set aside.

[KINGS GENERAL TERM, October 14, 1856. *Brown, S. B. Strong* and *Emott,* Justices.]